

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-21-2006

# Bayer Chem Corp v. Albermarle Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4321

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Bayer Chem Corp v. Albermarle Corp" (2006). *2006 Decisions.* Paper 1408.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1408

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-4321

———

BAYER CHEMICALS CORPORATION

v.

ALBERMARLE CORPORATION,

Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania,
(No. 04-cv-00585)
The Honorable Donetta W. Ambrose, District Judge

———

Argued March 9, 2006
Before:   ROTH and ALDISERT, <u>Circuit Judges</u>, and RODRIGUEZ,[*] <u>District Judge</u>

(Filed March 21, 2006)

A. Marvin Quattlebaum, Jr., Esq. (Argued)
Rivers S. Stilwell, Esq.
Nelson Mullins Riley & Scarborough, L.L.P.
104 South Main Street, Suite 900
P.O. Box 10084
Greenville, South Carolina 29601

Eric N. Anderson, Esq.
Carl A. Eck, Esq.

---

[*] The Honorable Joseph H. Rodriguez, Senior District Judge, United States District Court
for the District of New Jersey, sitting by designation.

Meyer, Darragh, Buckler, Bebeneck & Eck, P.L.L.C.
U.S. Steel Tower, Suite 4850
600 Grant Street
Pittsburgh, PA 15219

      Counsel for Appellant

Michael D. Warden, Esq. (Argued)
Joseph R. Palmore, Esq.
Sidley Austin Brown & Wood LLP
1501 K St., NW
Washington, DC 20005

Dr. John E. Murray, Jr., Esq.
Jon Hogue, Esq.
Timothy Murray, Esq.
Murray, Hogue & Lannis
3400 Gulf Tower
Pittsburgh, PA 15219

Todd A. Portzline, Esq.
LANXESS Corporation
111 RIDC Park West Dr.
Pittsburgh, PA 15275

      Counsel for Appellee

---

**OPINION**

---

ALDISERT, <u>Circuit Judge</u>.

Albermarle Corporation appeals from an adverse ruling of the United States District Court for the Western District of Pennsylvania granting Bayer Chemicals Corporation's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal

2

Rules of Civil Procedure. The Court also denied Albermarle's motion for judgment on the pleadings. We have jurisdiction to hear the present appeal pursuant to 28 U.S.C. § 1291. We will affirm.

I.

Because the parties are familiar with the facts and proceedings in the District Court we will only briefly revisit them here.

A.

On October 1, 1997, Bayer (the successor-in-interest to Cytec Industries, the original purchaser under the Sales Agreement),[1] and Albermarle entered into a Sales Agreement under which Albermarle agreed to supply and Bayer agreed to purchase 100% of Bayer's requirements of a C16-C18 compound, alkenyl succinic anhydride ("ASA"), which is used in the paper sizing industry. The parties determined that the ASA chemical compound covered by the Sales Agreement would be known as "PRODUCT" (hereinafter "Product"). The only definition of Product contained in the Sales Agreement, which is found in one of the opening clauses, simply qualifies the substance as "C16-C18 alkenyl succinic anhydride (hereinafter referred to as 'PRODUCT')." The agreement had a five-year term, could only be terminated thereafter with the provision of two years notice, and

---

[1] In the Summer of 2000, Cytec sold its paper chemicals operations to Bayer. Because of this acquisition Albermarle agreed to an assignment of Cytec's obligations under the Sales Agreement to Bayer. The parties also agreed upon a three-year extension of the Sales Agreement, until September 30, 2005.

3

it expressly stated that it can only be modified by a written document signed by the party claimed to be bound.

The Sales Agreement contains provisions that allow for modification or supplementation of the Product specifications, and escape from the overall commitment if certain conditions are met. The main such provision, Section 1.7, is central to the present dispute.[2] Essentially, it states that if Bayer decides to "reformulate or substitute another

---

[2] In its entirety, Section 1.7 states:

> If [Bayer] should during the term of this Agreement desire to reformulate or substitute another material or compound for PRODUCT in [Bayer's] alkaline paper sizing business which would reduce the volume of PRODUCT to be purchased from Albermarle, then [Bayer] will so notify Albermarle in writing of such reformulation or substitution and give Albermarle the first opportunity (as against any third party and/or self-production) to supply [Bayer's] requirements for the reformulated or substituted material or compound. If after good faith negotiations on the supply of the reformulated or substituted material or compound, [Bayer] decides to procure the reformulated or substituted material or compound from another party or produce such reformulated or substituted material or compound itself, then prior to commencing the procurement or self-production of the reformulated or substituted material or compound, Albermarle will have first right of refusal to meet the competitive third party or self-production economics to supply to [Bayer's] requirements for the reformulated or substituted material or compound for use in alkaline paper sizing. . . under the same terms and conditions offered by the third party. . . . Albermarle will have thirty (30) days from receipt of written notice from [Bayer] notifying Albermarle of its right of first refusal to match such third party offer to match such terms and conditions offered by the third party, and in the event Albermarle agrees to match the third party offer and supply the quantities of reformulated or substituted material or compound so desired, Albermarle will have 18 months within which to begin supply of such reformulated or substituted material or compound.

4

material or compound for Product," then the parties shall enter into negotiations to agree upon the supply of the new chemical. If an agreement is not reached following good faith negotiations, then Bayer has the right to seek the supply of the chemical from a third party. The section provides, however, that Albermarle shall have the first right of refusal, to be exercised within 30 days of receipt of notice of the requested change, to match any third-party offer for the reformulated or substituted chemical.

The other such provision designed to provide flexibility in the Sales Agreement for the parties' changing needs is Section 2.2, which essentially covers the supply in Europe, should it ever be required by Bayer, of small quantities of not more than 3.5 million pounds of alternative specification ASA, "whether C16-18 or otherwise." Should such alternative specification ASA be needed, the agreement requires that the parties negotiate the production, time frames and price of such a compound. If after six months of good faith negotiations no new agreement is reached on this alternative specification ASA, then Bayer would be free to look to other vendors for its needs. Albermarle, however, would have a right of first refusal, much like in Section 1.7, to match any third-party offers.

B.

From the date of implementation of the Sales Agreement until 2003, the parties operated under the agreement's terms. Although the Sales Agreement did not specify the

5

formula of Product to be supplied,[3] it is undisputed that until 2003 the formula of ASA supplied by Albermarle had consisted of 65% C16 and 35% C18 in a branched isometric form (the "65/35% mixture").

On September 22, 2003, Bayer sent a letter to Albermarle stating that it was exercising its rights under Section 1.7. The letter stated that Bayer "desires to procure a reformulated Product for use in Bayer's alkaline paper sizing business." The reformulation requested by Bayer was an ASA compound composed of 25% C16 and 75% C18 consisting of more than 95% in a linear isometric form (the "25/75% mixture"). The letter then stated Bayer's desire to enter into negotiations with Albermarle for the supply of this reformulation. Thus, the 65/35% mixture would be changed to 25/75% mixture, retaining the same ingredients, but with a major change in proportions.

On December 1, 2003, Bayer sent a second letter to Albermarle. This letter notified Albermarle that Bayer had received an offer for the reformulated ASA from another vendor, and that, in compliance with Section 1.7, this letter was to serve as notice to Albermarle of this offer. Accordingly, the letter stated that Albermarle had thirty days from that date to exercise its right of first refusal with regard to the third-party offer.

On December 10, 2003, Albermarle wrote to Bayer objecting to the latter's use and

---

[3] The closest thing to a specification in the Sales Agreement for the formula of Product is stated at Section 2.1: "PRODUCT to be supplied under this Agreement shall conform at the time of shipment to the specifications in Exhibit A (attached)." The referenced Exhibit A, however, does not state the ASA formula or proportions of C16 and C18.

interpretation of Section 1.7. Albermarle stated that Section 1.7 was an improper mechanism for attempting to require it to meet any competitive offer for any C16-C18 ASA, regardless of the specific percentages of C16 or C18 requested in a reformulation. Albermarle then argued that (1) the term "Product" encompasses *any grade* of C16-C18 ASA, irrespective of percentages or linearity, and (2) Bayer is therefore obligated under Section 1.1.1 to purchase 100% of its requirements of ASA from Albermarle.[4] It then indicated that Section 2.2 already provided for the supplemental provision of alternative specification ASA. It stated that the application of Bayer's interpretation of Section 1.7 to allow it to purchase alternative specification ASA from a third party would then render the alternative specification purchase allowance under Section 2.2 irrelevant and meaningless.

Based on its interpretation of Section 1.7, Bayer treated Albermarle's response as a failure to exercise the right of first refusal and Bayer accordingly began purchasing the reformulated ASA from a third-party vendor and reduced the volume of its order from Albermarle. Albermarle contends that Bayer continues to purchase the alternative specification ASA from other vendors.

---

[4] In its memorandum supporting its Rule 12(c) motion, Albermarle contended that it was "ready, willing, and able" to supply this reformulated blend of Product, but that its only objection was to the lower price sought by Bayer. It then argued that Section 1.7 was not the proper means to dispute the pricing of ASA, as the parties had already agreed to the pricing of Product under the agreement.

C.

Seeking resolution of this dispute, on April 16, 2004, Bayer filed a complaint against Albermarle in the United States District Court for the Western District of Pennsylvania seeking injunctive relief and a declaratory judgment stating that it was not violating the terms of the Sales Agreement by purchasing reformulated Product from a third party. More specifically, it sought a declaration that Bayer offered Albermarle the opportunity to supply the reformulated Product, in compliance with Section 1.7, and Albermarle declined, thus freeing Bayer to purchase the reformulated Product from a third party.[5] Albermarle then answered and filed counterclaims. In its own request for declaratory relief, Albermarle asked the Court to declare that Bayer was in violation of the Sales Agreement because the requested reformulated version of Product was in fact encompassed by the term "Product" as used in the Sales Agreement and that Bayer therefore had no right under Section 1.7 to purchase the compound from another vendor.[6]

---

[5] Bayer's complaint sought a declaration that:

> Section 1.7 of the Sales Agreement furnished Bayer the right to: 1) procure a reformulated PRODUCT; and 2) procure the reformulated PRODUCT from third parties thereby reducing the volumes of PRODUCT that Bayer is required to procure from Albermarle under the Sales Agreement, in light of Albermarle's failure to exercise its right of first refusal to supply the reformulated PRODUCT.

(Complaint ¶ 23, App. at 24.)

[6] Albermarle asked the Court to declare that:

> Bayer has breached the terms of the Agreement [and] that Bayer has no

8

Contending that this case was purely a matter of contract interpretation, on June 30, 2004, Bayer filed a Rule 12(c) motion for judgment on the pleadings. One month later, on July 30, 2004, similarly contending that this case only concerns a legal question – the interpretation of the Sales Agreement – Albermarle responded with its own Rule 12(c) motion.

On October 12, 2004, the District Court granted Bayer's motion and rejected Albermarle's. The Court first concluded that the "relevant contract language [is] clear and unambiguous and can be construed without resort to extrinsic evidence " and that a "clear reading of the contract comports with [Bayer's] proffered interpretation." In so ruling for Bayer, the Court made the following determinations: (1) although the term "Product" in the Sales Agreement was vague and only referred to the ASA composition as "C16-C18 alkenyl succinic anhydride," the parties' course of performance of repeated supply and purchase of the 65/35% mixture of ASA clearly identified the meaning for the term "Product";[7] (2) Section 1.7 should be interpreted to state that "[Bayer] has the option of reformulating the Product, i.e., changing proportions of the ingredients of the C16-

---

contractual right to procure ASA Product from third parties [because] [t]here is no limitation of the percentages of C-16 or C-18 in the definition of "Product" in the Agreement or in the specifications of the "Product" attached as an exhibit to the Agreement.

(Answer and Counterclaim ¶¶ 38, 43, App. at 63.)

[7] Although not stated by the Court, this interpretation implicitly rejected Albermarle's broader definition of "Product."

9

C18, or substituting another material for the product, i.e., using other elements"; (3)

Bayer requested a reformulation; (4) Albermarle's suggested interpretation of Section 1.7

is "nonsensical" because its suggestion that the words "reformulate" and "substitute" both

take as their object the words "another material or compound for PRODUCT" would

render the term "reformulate" meaningless because it would serve no purpose not already

then accomplished by the term "substitute";[8] (5) Albermarle's reliance upon Section 2.2

to distinguish the meaning of Section 1.7 is of no avail because Section 1.7 "deals with

the scenario present here, where Bayer desires to obtain something in lieu of the Product,"

whereas Section 2.2 "deals with additional purchases"; (6) and finally, because Bayer

requested a reformulation of the Product, which Albermarle refused to supply after being

offered its right of first refusal, Bayer was "thus entitled to procure reformulated Product

from the third-party suppliers."   This appeal then followed.

## II.

We exercise plenary review over a Rule 12(c) motion for judgment on the

pleadings.  Jablonski v. Pan Am. World Airways, Inc., 863 F.2d 289, 290 (3d Cir. 1988).

"Under Rule 12(c), judgment will not be granted unless the movant clearly establishes

that no material issue of fact remains to be resolved and that he is entitled to judgment as

a matter of law."  Id. (citations and quotations omitted).  "In reviewing the grant of a Rule

---

[8]  The Court had previously determined that the term "reformulate" does not take as its object the words "another material or compound for PRODUCT."  Rather, it stated that the object of the term "reformulate" was only the term "PRODUCT."

10

12(c) motion, we must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." Id. at 290-291 (citations and quotations omitted). We, however, "need not accept as true legal conclusions or unwarranted factual inferences." Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999).[9]

---

[9] Albermarle argues that the District Court committed error by failing to view the facts pled in the light most favorable to the non-moving party, Albermarle. To support its argument, Albermarle finds it significant that, in stating its standard of review for Rule 12(c) motions, the Court referred to the term "Complaint" and not the term "Albermarle's counterclaim." (See Opinion of the District Court, app. at 4 ("I 'may dismiss the complaint only if its clear that no relief could be granted . . ..'").) This is merely a typographical error produced by the Court's use of direct quotations in stating the standard of review. We can find no subsequent error produced by this misprint.

Albermarle also contends that the Court erred because it failed to treat each party's motion for judgment on the pleadings separately. It found it significant that the Court initially observed that each party contended that the Sales Agreement is unambiguous. It then contends that because the Court repeatedly noted arguments made by both parties in their Rule 12(c) motions it consequently failed to construe the facts in Albermarle's favor, as the non-moving party. We disagree. The Court itself recognized that this case turned entirely upon a question of law, the interpretation of the Sales Agreement. Moreover, although it observed that both parties argued that the contract is unambiguous, and noted their disagreement over the term Product, it thereafter properly conducted a *de novo* interpretation of the contract. See Winn v. Aleda Const. Co., Inc., 315 S.E.2d 193, 194 (Va. 1984) ("When a contract is clear and unambiguous, it is the duty of the court, and not the jury, to decide its meaning."). Accordingly, other than the evidence of the parties' course of performance, which is not in dispute, the facts alleged in Albermarle's counterclaim are irrelevant. We therefore find no error in the Court's brief reference to both parties' motions. Indeed, after observing that the parties disagreed on the meaning of the term Product, it subsequently stated that such disagreement had no bearing on whether a term in a contract is ambiguous. See Galloway Corp. v. S.B. Ballard Const. Co., 464 S.E.2d 349, 354 (Va. 1995). Finally, we must note that insofar as Albermarle is arguing that the Court failed to accept as true Albermarle's proffered interpretation of the Sales Agreement, the Court was correct to so disregard Albermarle's arguments on this issue. Both the interpretation of a contract and whether a contract is ambiguous are

11

Furthermore, although we apply the Federal Rules of Civil Procedure to this case because it is a diversity action in federal court, Virginia's substantive law applies to the present action pursuant to the choice-of-law provision in the Sales Agreement. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (holding that federal courts sitting in diversity should apply the conflict of law rules of the forum state); Churchill Corp. v. Third Century, Inc., 578 A.2d 532, 537 (Pa. Super. Ct. 1990) ("Pennsylvania courts will uphold choice-of-law provisions in contracts to the extent that the transaction bears a reasonable relation to the chosen forum."). Finally, because the Sales Agreement deals in the sale of goods, this contract is governed by Virginia's enactment of the Uniform Commercial Code. See Va. Code Ann. § 8.2-102 (2005).

III.

Albermarle asserts nine separate grounds[10] for why the District Court erred by

_____

questions of law, and in construing a Rule 12(c) motion, a court is not required to defer to a parties' legal conclusions, which would include suggested interpretations of a contract provision. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

[10] Justice Robert H. Jackson once commented:

> Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one. Of course, I have not forgotten the reluctance with which a lawyer abandons even the weakest point lest it prove alluring to the same kind of judge. But experience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.

Jackson, Advocacy Before the United States Supreme Court, 25 Temple L.Q. 115, 119

granting Bayer's Rule 12(c) motion. Our review of its nine contentions, however, can be reduced to two main questions: (1) was the Court correct in concluding that the Sales Agreement was unambiguous and able to be interpreted by resorting solely to evidence of the parties' course of performance; and, if so, (2) did the Court properly grant Bayer's Rule 12(c) motion?

Because the issue now before us turns solely turns upon the interpretation of the Sales Agreement, we defer to the Virginia Supreme Court's guidance for interpreting contracts:

> [W]e have often said that it is the duty of the court to construe a contract as written: "It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." Meade v. Wallen, 226 Va. 465, ---, 311 S.E.2d 103, 104 (1984); Magann Corp. v. Electrical Works, 203 Va. 259, 264, 123 S.E.2d 377, 381 (1962). A corollary to the last stated principle is that courts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein. See Virginian Ry. Co. v. Avis, 124 Va. 711, 719, 98 S.E. 638, 640 (1919). Finally, on review, we are not bound by the trial court's construction of the contract provision here in issue. See Hutchison v. King, 206 Va. 619, 625, 145 S.E.2d 216, 221 (1965). We have an equal opportunity to consider the words within the four corners of the disputed provision.

Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984), cited with approval in PMA Capital

---

(1951); see also Buehl v. Vaughn, 166 F.3d 163, 174 (3d Cir. 1999) (commenting that "[o]ne element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise").

13

Ins. Co. v. US Airways, Inc., 626 S.E.2d 369, 372 (Va. 2006).

Relying on the foregoing precepts, and after a thorough examination of the Sales Agreement, the District Court Opinion and both parties' proffered interpretations, we conclude as a matter of law that the Court was correct in determining that the Sales Agreement is unambiguous. We agree with the Court that although the Sales Agreement only refers generically to the composition of Product as "C16-18 alkenyl succinic anhydride," that term was refined and explained by the parties' course of performance, which was the consistent and sole supply over the course of several years of a mixture of 65% C16 and 35% C18 in a branched isometric form. See Va. Code Ann. § 8.2-202(a) (2005).[11] We also conclude that this interpretation of Product is the best way to give full effect to the terms of Section 1.7.

### A.

Albermarle contends that this interpretation of the Sales Agreement is incorrect. It first asserts, like Bayer, that the contract is unambiguous, but then contends that the term

---

[11] Section 8.2-202(a) of the Virginia Code states that:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

> (a) by course of performance, course of dealing or usage of trade (§ 8.1A-303) . . .

14

"Product" broadly encompasses any combination of C16-C18, not just the 65/35% mixture produced over the parties' course of performance. It argues that the course of performance evidence, as extrinsic evidence outside of the four corners of the contract, is being improperly used to contradict the plain terms of the agreement. It also argues, citing to § 8.1A-303(e) of the Virginia Code,[12] that even if course of performance evidence were admissible at the Rule 12(c) stage, such evidence must be construed in conformity with the terms of the agreement, and because the admission of this evidence created an unreasonable contradiction in the agreement's meaning, the express terms of the Sales Agreement should have prevailed. Finally, it argues that this usage of course of performance directly contravenes the Sales Agreement's merger clause found at Section 19.

We reject these arguments. First, although the Sales Agreement may only provide a generic definition of the term "Product," that definition was refined by the parties' course of performance. See Va. Code Ann. § 8.2-202(a) (2005). Second, the course of performance evidence is not being used to contradict the terms of the contract, but to

---

[12] Section 8.1A-303(e)(1) provides:

Except as otherwise provided in subsection (f), the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed whenever reasonable as consistent with each other. If such a construction is unreasonable:

(1) express terms prevail over course of performance, course of dealing, and usage of trade  . . .

clarify them, which is a proper usage under the Virginia U.C.C.  See Va. Code Ann. §

8.1A-303(d)  (stating that course of performance evidence "may give particular meaning

to specific terms of the agreement, and may supplement or qualify the terms of the

agreement").  Moreover, the evidence of the parties' course of performance does not

contradict the terms of the Sales Agreement in violation of § 8.1A-303(e) of the Virginia

Code.  The Sales Agreement called for the provision of "C16-18 alkenyl succinic

anhydride" and that was what was sold throughout the parties' course of performance. [13]

---

[13]  Albermarle also argues that course of performance evidence was not even created via
the parties' sole provision of the 65/35% mixture over the course of several years.  It
argues that pursuant to § 8.1A-303(a) of the Virginia Code, course of performance
evidence is only created where the one party acts and the other party, with knowledge of
and the ability to object to the performance, acquiesces in it without objection.  See Va.
Code Ann. § 8.1A-303 (2005).  Because Albermarle believed that the term Product
encompassed *any* mixture of C16-C18, it contends that it had no reason to object to the
65/35% mixture.  Phrased rhetorically, why would Albermarle be expected to object or
acquiesce – which it argues denotes acceptance of a non-conformity – to a performance
that it believed to conform to the terms of the Sales Agreement?  We reject this
interpretation of the means of creating course of performance evidence.  First, Albermarle
cites to no cases for this proposition.  Second, the Virginia U.C.C. does not indicate that
course of performance evidence can only be formed by non-complying performance.  To
the contrary, the Virginia U.C.C. states that course of performance evidence (1) is
"relevant in ascertaining the meaning of the parties' agreement," (2) can qualify or give
particular meaning to a term, and that when used in such a role, (3) such evidence
becomes part of the contract.  See Va. Code Ann. § 8.1A-303(d) (2005); Va. Code Ann. §
8.2-202 (2005), comment 2 ("[T]he course of actual performance of the parties is
considered the best indication of what they intended the writing to mean."); Va. Code
Ann. § 8.1A-201(3) (2005) ("'Agreement,' as distinguished from 'contract,' means the
bargain of the parties in fact, as found in their language or inferred from other
circumstances, including course of performance . . ..").  Accordingly, admissible course
of performance evidence was created through the repeated supply of the 65/35% mixture,
even if it was "complying" performance.

16

Finally, the use of course of performance evidence does not contravene the merger clause of Section 19. Section 8.2-202 of the Virginia Code explicitly states that "a writing intended by the parties as a *final expression* of their agreement . . . may be explained or supplemented . . . by course of performance . . .." Va. Code Ann. § 8.2-202 (2005) (emphasis added). The merger clause does not prevent the use of course of performance evidence to help explain the Sales Agreement.

B.

In the alternative, Albermarle argues that the Sales Agreement is ambiguous and that because of this ambiguity, the Court was required to consider other extrinsic evidence beyond just course of performance to ascertain the Sales Agreement's meaning. See Video Zone, Inc. v. KF & F Props., 594 S.E.2d 921, 923 (Va. 2004) (stating that a Court will allow the introduction of extrinsic evidence when a contract is ambiguous).

Again, we disagree. The term Product, as used in the Sales Agreement, is not ambiguous. See Wilson, 313 S.E.2d at 398 (stating that ambiguity in a contract is a question of law). For an ambiguity to exist, it must be apparent on the face of the agreement by apparently referencing "two or more things at the same time." Video Zone, 594 S.E.2d at 923-924. Here, the Sales Agreement unambiguously defines Product as a mixture of "C16-18 alkenyl succinic anhydride." A doubtfulness of meaning only arises through the parties' current dispute over the percentage mixture of C16-C18. This dispute, however, is immaterial as to ambiguity *vel non*, because a contract is "not

17

rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement." Wilson, 313 S.E.2d at 398.

Finally, notwithstanding the general rules that extrinsic evidence cannot be used to explain integrated agreements and that it may otherwise only be examined where a contract is ambiguous, the District Court did not err here by examining the extrinsic evidence of the parties' course of performance. First, pursuant to § 8.2-202 of the Virginia Code, the parties' course of performance may always be examined to help explain a contractual term. Second, a finding of ambiguity is not required before course of performance evidence may be introduced. See Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3, 9 (4th Cir. 1971) (examining and applying § 8.2-202). Accordingly, the Court did not err by solely examining one form of extrinsic evidence, the parties' course of performance, because the Sales Agreement is unambiguous and § 8.2-202 frees such evidence of many of the restraints on the use of extrinsic evidence.

## C.

We next turn to Albermarle's arguments on the application of Section 1.7. The District Court concluded that, in compliance with the terms of Section 1.7, Bayer's request for a 25/75% mixture constituted a request for a reformulation, which Albermarle rejected. Albermarle assails this interpretation of Section 1.7 with a host of arguments as to why the Court's interpretation was incorrect. Chiefly, Albermarle argues that Section 1.7's right of first refusal is only triggered when Bayer requests the supply of a compound

18

composed of something other than a C16-C18 blend, which Bayer's request was not. It supports this contention by arguing that the terms "reformulate" and "substitute" of Section 1.7 must both take as their objects the phrase "another material or compound for product."

We again reject Albermarle's reading of the Sales Agreement. "[T]here is a presumption that the parties have not used words aimlessly" and we will not treat a phrase or term as being "meaningless if a reasonable meaning can be given to it." See Winn, 315 S.E.2d at 195. We have already determined that the term Product only encompasses the 65/35% mixture supplied throughout the prior operation of the Sales Agreement. This consequently guides our interpretation of Section 1.7. Accordingly, Albermarle's proffered interpretation of Section 1.7 is unworkable because to have both the terms "reformulate" and "substitute," rather than just "substitute," take as their objects the phrase "another material or compound," would render the term "reformulate" superfluous. "Reformulation" would then assume no meaning that is not already encapsulated by the term "substitute." We must therefore reject that interpretation.

Conversely, the District Court's interpretation of "reformulation" gives each term a distinct meaning, i.e., "to reformulate" means to change the proportion of ingredients and "to substitute" means to incorporate other elements. Indeed, the Court culled these

19

definitions from the dictionary, which is most helpful here.[14] Turning to the dictionary,

we begin with the root word "formula," which is defined as: "a recipe or prescription

giving method and proportions to ingredients for the preparation of some material."

Webster's Third New International Dictionary 894 (1968). "To formulate" is defined as

"to reduce or express in or as if in a formula." Id. And finally, "to reformulate" means

"to formulate again; *esp*: to formulate in a different way." Id. at 1909. Based on these

definitions, the Court's interpretation of Section 1.7 was correct.

This interpretation of Section 1.7 is bolstered both by our premise that the Sales

Agreement is unambiguous and by our restrictive 65/35% mixture definition of Product.

Once the 65/35% mixture became the *de facto* Product due to the parties' course of

performance, that was the formula, and a deviation from that mixture would be a

---

[14] Albermarle also argues that the District Court erred by using the website, Dictionary.com, at the Rule 12(c) stage to aid in its interpretation of Section 1.7. We conclude, however, that this was not an impermissible resort to extrinsic evidence to aid in the interpretation of an unambiguous contract. Virginia courts commonly resort to dictionaries to help explain the meaning of an unambiguous contract term, and because contract interpretation is a question of law it was not error to examine the dictionary in this instance. See Gordonsville Energy, L.P. v. Virginia Elec. & Power Co., 512 S.E.2d 811, 817 (Va. 1999) (using a dictionary to explain an unambiguous contract term); Charles E. Russell Co. v. Carroll, 74 S.E.2d 685, 687 (Va. 1953) (same); see also In re Envirodyne Indus., Inc., 29 F.3d 301, 305 (7th Cir. 1994) (Posner, J.) ("[D]ictionaries . . . and other published materials created by strangers to the dispute, like evidence of trade usage, which is also admissible because it is also evidence created by strangers rather than by a party trying to slip out of a contractual bind, do not present a similar danger of manufactured doubts and are therefore entirely appropriate for use in contract cases as interpretive aids. Appropriate, and sometimes indispensable."). Moreover, the definitions cited by the District Court from Dictionary.com reflect, or are not materially different from, those found in Webster's Third New International Dictionary (1968).

reformulation.  Accordingly, we agree with the District Court and Bayer that Section 1.7 contemplates that once the parties agreed upon a formulation of Product, which they did as evidenced by the supply of the 65/35% mixture, a later desire to reformulate the product, as evidenced by Bayer's desire to switch to the 25/75% mixture, would trigger Section 1.7.[15]

IV.

We find no merit to Albermarle's final argument that it did not decline to produce the 25/75% mixture, but rather only declined to produce the 25/75% mixture at the price requested by Bayer.  Following unsuccessful negotiations on the supply of reformulated product, Section 1.7 allows Albermarle to match the offer of a third party who has offered

---

[15]  The existence of Section 2.2 does not alter our interpretation of Section 1.7, and our interpretation of Section 1.7 does not negate the applicability of Section 2.2.  The two provisions serve entirely different purposes.  Section 2.2 deals with the need, unanticipated or otherwise, of up to 3.5 million pounds in Europe of "Alternate-Specification ASA," whether C16-C18 or otherwise, that is materially different from those specifications listed at exhibit A of the agreement.  Conversely, Section 1.7 deals with the reformulation or substitution of another material or compound for Product. Albermarle argues that "Section 2.2 proves that the parties who drafted the Agreement knew how to make their intent clear that a section of the Agreement could apply to changes in specifications the result of which was a compound that was still C16-C18 ASA" and that "[i]f Section 1.7 was intended to apply to specification changes that resulted in a compound that was still C16-C18 ASA, the parties could and presumably would have used identical or similar language."  It then argues that the parties' "failure to do so proves that Section 1.7 was not intended to apply to reformulations or substitutions that resulted in ASA that was still composed of C16 and C18," as was requested here. Although we agree that the difference in language between Section 1.7 and Section 2.2 is some evidence of the parties' ability to be specific or general in their drafting, it is not sufficient to persuade us that the term "Product" is not wholly refined and explained by the parties' course of performance evidence.

21

to supply Bayer with the desired reformulated Product. Section 1.7 does not allow Albermarle to haggle over price in exercising its right of first refusal, it only allows for Albermarle to match the offer.[16] Accordingly, a refusal to match the third-party offer based upon price concerns is still a rejection and a failure to exercise the right of first refusal. We conclude that, in compliance with section 1.7, Bayer: (1) sought a reformulation, (2) allowed Albermarle their right of first refusal, which was not exercised, and (3) was therefore freed from its obligations under the Sales Agreement. The District Court correctly granted Bayer's Rule 12(c) motion for judgment on the pleadings.

* * *

We have considered all contentions raised by the parties and conclude that no further discussion is necessary. The judgment of the District Court will be affirmed.

_____

[16] Albermarle argues that it is a question of fact as to whether it declined to supply the reformulated Product, and that the Court erred by construing the facts against Albermarle as the non-moving party. The Court committed no such error. It is plain from Albermarle's counterclaim that it disagreed with Bayer's use of Section 1.7, and never exercised its right of first refusal to match the third-party offer to supply reformulated Product. Albermarle's repeated incorrect interpretation of Section 1.7 does not excuse its failure to exercise its rights under that provision. The Court was therefore correct in concluding that the right of first refusal was not exercised.