

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-20-2006

# Prior v. Innovative Comm Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2044

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Prior v. Innovative Comm Corp" (2006). *2006 Decisions.* Paper 309.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/309

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 05-2044/2199
_____

CORNELIUS PRIOR, JR.

v.

INNOVATIVE COMMUNICATIONS CORP
f/n/a ATLANTIC TELE-NETWORK CO


Cornelius B. Prior, Jr.,

Appellant

_____

On Appeal from the District Court
of the Virgin Islands
(Division of St. Thomas District Court No. 99-cv-00232)
District Judge: Honorable Stanley S. Brotman

_____

Argued on May 9, 2006

Before: FISHER, COWEN, and ROTH*, <u>Circuit Judges</u>

(Opinion Filed:    October 20, 2006)

_____

*Judge Roth assumed senior status on May 31, 2006.

Joel H. Holt, Esquire (Argued)
Law Offices of Joel H. Holt
2132 Company Street
Suite 2
Christiansted, St. Croix
U.S. Virgin Islands,   00820

           Counsel for Appellee


J. Daryl Dodson, Esquire (Argued)
Moore, Dodson & Russell
P.O. Box 310
5035 Norre Gade
Charlotte Amalie, St. Thomas
U.S. Virgin Islands,   00804

           Counsel for Appellant

_____

**O P I N I O N**

_____

ROTH, Circuit Judge:

Cornelius Prior has appealed the decision of the District Court for the Virgin Islands holding that the restructured company, Atlantic Telenetwork, Inc., is liable for Prior's supplemental pension benefit.  For the reasons stated below, we will affirm the judgment of the District Court.

**I.  Background**

Cornelius Prior and Jeff Prosser were co-CEOs of Atlantic Tele-Network, Inc.,  (old ATNI), a telecom company with assets in the Virgin Islands and Guyana.  Prior and Prosser

controlled the majority of ATNI's stock.  The rest was publicly held.   Prior and Prosser had personal disagreements that deadlocked ATNI's management.  The deadlock resulted in a split-up of ATNI in December 1997.

In the split-up transaction, ATNI transferred all the stock of its subsidiary Atlantic Tele-Network Co. (ATNC) and its ownership interest in the Virgin Islands Telephone Company to a company now called ICC (formerly ECI).  Prosser exchanged all of his ATNI stock for a majority interest in ICC.  Prior exchanged all of his ATNI stock for $17.4 million and a majority interest in restructured ATNI (new ATNI), which retained ownership of Guyanese Telephone & Telegraph (GT&T).  The public shareholders of ATNI exchanged their stock for stock in ICC and new ATNI.  Thus, after the split-up, Prosser controlled the Virgin Island assets in a company now called ICC, while Prior retained control of the Guyanese assets via new ATNI.   New ATNI retained only five of the old ATNI employees; the others went to ICC.

The issue in this case is the allocation after the split-up of the obligation to pay Prior's supplemental pension benefit.  Prior's 1987 ATNC employment agreement  granted him a regular ERISA qualified pension benefit and a supplemental, non-ERISA qualified "top hat" pension.  Unlike the regular pension benefit, the supplemental benefit was an unfunded liability; no dedicated trust asset existed before the split-up to fund the supplemental benefit.

The documentation for the split-up transaction included an Employee Benefits Agreement (EBA) that allocated various pension assets and liabilities to ICC.  The EBA, which provides that it shall be governed by New York law, contained three clauses dealing

3

with allocation of pension assets and liabilities.

1. Effective as of the Closing, (i) [ICC] shall adopt as its own the Atlantic Tele-Network, Inc. Defined Benefit Plan for Salaried Employees, the Atlantic Tele-Network, Inc. Management Employees' Savings Plan, and the Atlantic Tele-Network, Inc. Employees' Stock Ownership Plan (collectively, the "*ATNI Plans*"), (ii) each of the trusts (and all the assets thereof) forming a part of the ATNI Plans shall be assumed by [ICC], and (iii) [ICC] and [ATNI] shall take such action, including amendments to the ATNI Plans (or the trusts forming a part thereof), as is necessary in order for [ICC] to be the sponsor and "Employer" under such ATNI Plans. As of the Closing, employees of ATNI and its subsidiaries shall cease participation in the ATNI Plans maintained by ICC or any of its subsidiaries.

2. All other employee benefit plans maintained by ATN Co., a U.S. Virgin Islands corporation ("ATNC"), by Virgin Islands Telephone Corp., a U.S. Virgin Islands corporation ("Vitelco") or by any of their subsidiaries (the "ATNC/Vitelco Plans"), including but not limited to the Virgin Islands Telephone Corporation Pension Plan for Hourly Employees, the United Steelworkers of America 401(k) Plan for Bargaining Unit Employees of Vitelco, the Welfare Plan for Salaried Employees and the Welfare Plan for Bargaining Employees, shall continue to be sponsored by such entities after the Closing. As of the Closing, employees of the ATNI and its subsidiaries shall cease participation in the ATNC/Vitelco Plans maintained by [ICC], ATNC, Vitelco or any of their subsidiaries.

3. Effective as of the Closing, [ICC] and its subsidiaries shall assume all employment-related liabilities and obligations of ATNI toward those employees who prior to the Closing were employed by ATNI and who after the Closing will be employed by [ICC] or its subsidiaries. Such employment-related liabilities and obligations shall include, but are not limited to, liabilities and obligations with respect to wages, withholding taxes, benefits, accrued vacation, employee benefit plan contributions and administrative expenses, whether incurred or accrued before, on or after the Closing and whether or not reported as of the Closing.

The EBA also includes an integration clause:

5. The foregoing is the entire agreement of the parties with respect to the subject matter hereof and may not be amended, supplemented, canceled or discharged except by a written instrument executed by the parties hereto. This Employee Benefits Agreement supercedes any and all prior agreements among the parties hereto with respect to the matters covered hereby.

Prior claims that ICC owes him a lump sum supplemental benefit of $723,113.57. ICC initially counterclaimed for damages due to an accounting of funds between the parties after the split-up transaction. ICC then moved to amend its counterclaim to include a claim for reformation of the split-up transaction to reflect the parties' intent. Prior opposed the motion to amend and moved to dismiss the existing counterclaims.

The District Court found that ICC's counterclaims based on accounting for the split-up transaction were not logically related to Prior's claim, and thus non-compulsory. For that reason, it dismissed them for lack of jurisdiction. The District Court denied as moot the motion to add the counterclaim to reform the EBA since that motion did "not affect the Court's determination that subject matter jurisdiction does not exist over Defendant's counterclaim."

Regarding the allocation of Prior's supplemental benefit in the EBA, the District Court found that "[i]n consideration of the conflicting testimony and the document itself," the EBA was ambiguous regarding the assignment of liability for Prior's supplemental benefit. Therefore, it looked to extrinsic evidence to determine allocation of the liability. The District Court concluded that the history of the parties' negotiations showed that the original idea was to divide pension assets and liabilities, including the supplemental benefits of Prior and Prosser, between the successor entities, according to where the transaction allocated old ATNI employees, including Prior and Prosser. This was the plan in the parties' preliminary negotiations and was included in their Principal Terms Agreement (PTA).

Before the split-up transaction closed, however, the parties decided, on the advice of

5

their accounting firm, Deloitte & Touche, to allocate all employee benefit liabilities to ICC, which would then terminate the plan participation of the five old ATNI employees who remained with new ATNI. These employees would receive a lump sum payment of their accrued pension benefits. Prior claimed that based on this new transaction structure, ICC assumed liability not only for his basic ERISA-qualified benefit but also for his non-qualified supplemental benefit. ICC, however, contended that the new arrangement was intended to cover only ERISA-qualified plans.

The District Court found that, based on the course of negotiations, the parties intended a new structure only for ERISA-qualified plans and that the weight of the extrinsic evidence was that the parties intended to retain their original allocation of Prior and Prosser's supplemental benefits. Accordingly, the District Court entered judgment in favor of ICC.

Prior appealed, asserting that the District Court erred in considering extrinsic evidence in its evaluation of contract ambiguity; in its finding that the EBA was ambiguous, and in its conclusion that the EBA did not allocate liability for Prior's supplemental benefit to ICC. ICC has cross-appealed, contending that the District Court erred in denying its motion to amend its counterclaim because, unlike its other counterclaims, the claim for contract reformation was a compulsory counterclaim. Thus, ICC asserts that the District Court did have jurisdiction over the reformation claim and that the motion was not mooted by the District Court's dismissal of the original counterclaims.

The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(a). We have jurisdiction under 28 U.S.C. § 1291.

6

## III. Discussion

### A. What Law Applies?

The EBA provides that it "shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed wholly therein." The District Court did not consider choice of law. Indeed, it did not cite any cases in its discussion of allocation of liabilities under the EBA.

ICC argues in a footnote that Prior waived the choice of law provision by not arguing that the District Court should follow New York law. Prior, however, stated that the EBA provides that New York law governs interpretation of the agreement. He also cited to New York cases or to Third Circuit cases applying New York law in his Memorandum in Support of Summary Judgment and Proposed Findings of Fact and Conclusions of Law. For that reason, the choice of law issue was not waived. Prior set out his choice of law claim. ICC clearly noticed it but never made it a point of contention before the District Court. Thus, if there was any waiver of the choice of law issue, it was by ICC for not countering Prior's reliance on New York law.

Federal courts sitting in diversity must apply the choice of law rules of the state in which they sit. Klaxon Co. v. Stentor Co., 313 U.S. 487 (1941). The territorial law of the Virgin Islands incorporates by statute the ALI Restatements of the Law. V.I. CODE ANN. tit. 1, § 4; Swift, 16 Pet. at 18-19. The Restatement (Second) of Conflicts of Laws § 187 provides that, with certain exceptions not relevant here, "the law of the state chosen by the parties to govern their contractual rights and duties will be applied." Accordingly, we will defer to the

7

EBA's choice of law provision and apply New York law.

### B. Did the District Court Err in Considering Extrinsic Evidence to Determine Contractual Ambiguity?

Prior claims that the District Court erred in considering extrinsic evidence because the EBA was an integrated contract. The EBA contains an integration clause, but such a clause affects only the application of the parol evidence rule. See Sunbury Textile Mills, Inc. v. Comm'r, 585 F.2d 1190, 1197 (3d Cir. 1978). The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." Richard A. Lord, Williston on Contracts, § 33 (4th ed. 1999). Under New York law, "A completely integrated contract precludes extrinsic proof to add to or vary its terms." Primex Int'l Corp. v. Wal-Mart Stores, 679 N.E.2d 624, 627 (N.Y. 1997).

An integration clause, however, does not preclude the use of extrinsic evidence, including the course of negotiations, to interpret ambiguous terms in order to determine parties' intent. Martin v. Monumental Life Ins. Co., 240 F.3d 223, 233 (3d Cir. 2001) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible, however, to establish the meaning of ambiguous terms in the writing, whether or not the writing is integrated."). "An integration clause, no matter how well-crafted, cannot change whether words in a contract are ambiguous and thus subject to varied interpretations." Harbour Cove Marine Servs. v. Rabinowitz, 2005 U.S. Dist. LEXIS 36794, at *9 (D.N.J.

2005). See also Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010, n.9 (3d Cir. 1980).

Under New York law, a contract's ambiguity must be determined solely in reference to the text of the contract.[1] Chimart Assocs. v. Paul, 489 N.E.2d 231, 233 (N.Y. 1986). See also, Breed v. Ins. Co. of N. America, 385 N.E.2d 1280, 1282 (N.Y. 1978); Hatco Corp. v. W.R. Grace & Co., 59 F.3d 400, 405 (3d Cir. 1995) (applying New York law); Banque Arabe et Internationale d'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 152 (2d Cir. 1995); Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 527 (2d Cir. 1990); Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 734 & n. 9 (2d Cir. 1984) (disagreeing with trend toward making contextual inquiry to determine whether language ambiguous). Intrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face. W.W.W. Assoc., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990).

The District Court examined both intrinsic and extrinsic evidence in making its determination that the EBA was ambiguous; it noted that "In consideration of the conflicting testimony and the document itself, . . . the EBA [is] ambiguous and not controlling." Under New York law, the court erred in considering extrinsic evidence. This does not mean,

---

[1]The general trend among courts is that the presence of an integration clause does not prevent the examination of extrinsic evidence to determine whether a contract is ambiguous. See Senior Exec. Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.), 89 F.3d 143, 150 (3d Cir. 1996). New York, however, has not followed this majority position.

however, that reversal and remand are necessary.

## C.  Did the District Court Err in Determining Contractual Ambiguity?

A contract's ambiguity is a matter of law that we review *de novo*.  Hatco Corp., 59

F.3d at 405 (applying New York law); Reliance Ins. Co. v. Colonial Penn Franklin Ins. Co.

(*In re* Montgomery Ward & Co.), 428 F.3d 154, 161 (3d Cir. 2005).  Under New York law,

> [a] term is ambiguous when it is capable of more than one meaning when
> viewed objectively by a reasonably intelligent person who has examined the
> context of the entire integrated agreement and who is cognizant of the customs,
> practices, usages and terminology as generally understood in the particular
> trade or business.

Curry Road Ltd. v. Kmart Corp., 893 F.2d 509, 511 (2d Cir. 1990) (internal quotations and

citations omitted).  Examining the terms of the EBA, we conclude that it is ambiguous in the

language which supposedly governs the allocation of Prior's supplemental benefit.

The dispute in contract interpretation between Prior and ICC arises from the scope of

the catchall provision in Clause 2.  This language must be read in the context of the entire

agreement.  Rentways, Inc. v. O'Neill Milk & Cream Co., 126 N.E.2d 271, 273 (N.Y. 1955).

Clause 1 of the EBA transfers the specific pension liabilities and funding assets of specific

plans to ICC.  Prior's supplemental benefit is not among the specific liabilities listed in Clause

1.  Clause 2 provides that:

> All other employee benefit plans maintained by ATN Co. ("*ATNC*") . . .by
> Virgin Islands Telephone Corp. . . . or by any of their subsidiaries, including
> but not limited to [several enumerated plans] shall continue to be sponsored by
> such entities after the Closing.

Clause 2 also provides that employees of new ATNI will cease participation in those plans

10

after the closing. Clause 3 of the EBA provides that ICC will be responsible for:

> all employment-related liabilities and obligations of ATNI toward those employees who prior to the Closing were employed by ATNI and who after the Closing will be employed by [ICC] . . . [including] wages, withholding taxes, benefits, accrued vacation, employee benefit plan contributions and administrative expenses,

even if accrued before the closing.

Prior claims that his supplemental benefit is covered by Clause 2's catchall language, "All other employee benefit plans maintained by ATNC Co." He argues that his supplemental benefit is a "plan" that was "maintained" by ATNC. Prior's expert witness, Michael J. Tierney, testified that, for a non-qualified top hat plan, no active maintenance is required—a plan is "maintained" simply by existing. Prior also introduced extrinsic evidence about the drafting history of the EBA to support his claim, particularly that the PTA stated that "Obligations under any such employee benefit or pension plan with respect to Messrs. Prior and Prosser shall be allocated to Old ATNI and New ATN, as the case may be . . .."

ICC, on the other hand, contends that the supplemental benefit is not covered by the EBA. ICI alleges that the supplemental benefit is not a "plan" but a benefit under an individually negotiated contract. ICC notes that the benefit was never referred to as a "plan" in any of the documents generated by the parties. ICC, however, has not appealed the District Court's conclusion of law that "the supplemental benefit claimed by Plaintiff under the terms of the 1987 Employment Agreement constitutes a plan under ERISA and also qualifies as a 'top hat' plan." ICC nevertheless insists that "plan," as used in the EBA, refers solely to ERISA-qualified plans because the word "maintained" means that there must be plan

11

maintenance, *i.e.*, routine work such as ERISA filings required by 29 U.S.C. § 1023. No such filings were required for Prior's supplemental benefit.

A disagreement between parties about the meaning of a term in a contract does not mean that the contract is ambiguous. Bayer Chems. Corp. v. Albermarle Corp., 2006 U.S. App. LEXIS 6994, 21-22 (3d Cir. 2006). We believe, however, that, read as a whole, the EBA is ambiguous in its allocation of liability for the supplemental benefits.

The terminology of employee benefits comes from the provisions of ERISA. ERISA's terminology is consistent with Prior's interpretation. ERISA refers to pension plans as "plans maintained" regardless of whether the plan is qualified. An unqualified plan falls under section 201(2) of ERISA which exempts from ERISA's participation and vesting standards "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). This language indicates that the use of the term "maintained" in the EBA does not limit Clause 2 to ERISA-qualified plans; the natural way to read "plan" is as a broad term covering all pensions, ERISA-qualified or not.

Moreover, it is not difficult to communicate an intent that a catch-all cover only qualified plans or that it cover both qualified and unqualified ones. The plans specifically mentioned in Clause 2 are qualified plans. ICC has provided no reason why a distinction in the catch-all language would matter beyond avoiding liability for Prior's supplemental benefit, nor has ICI explained what function the catchall would serve if it did not cover Prior's supplemental benefit. New York law disfavors contract interpretations that lead to

12

superfluous language.  Fleischman v. Furgueson, 119 N.E. 400, 401 (N.Y. 1918).

Yet, if we adopt Prior's interpretation, the catchall language would cover only Prior's supplemental benefit, and the choice of the language used would be an unusual way to express such intent – especially in a document drafted by experienced attorneys who could easily have clarified the intent.  Prior, however, has not suggested that the catch-all covers anything other than Prior's supplemental benefit.  In view of the fact that there is no other mention of Prior's supplemental benefit in the EBA, the catch-all language of Clause 2 simply does not read like a contract provision allocating a specific non-ERISA-qualified liability to ICC.

The most natural reading of the catchall is simply that it is surplusage resulting from overcautious draftsmanship and that it does not reflect any specific intent of the parties that it include or exclude unqualified plans.  While a surplusage reading is disfavored, it is not an inelastic principle.  Prior's reading of "any other plans" to mean only his supplemental benefit stretches the EBA's language.  Because, therefore, there is no clear, objective manifestation of the parties' subjective intent in the use of language in the catch-all and because the catch-all itself could cover two scenarios, the EBA is ambiguous.  This determination of ambiguity has been made solely from the text of the EBA – and we can now look at extrinsic evidence to interpret the EBA.

**D.  Did the District Court Correctly Resolve the Ambiguity in the EBA?**

We review the District Court's interpretation of an ambiguous contract on a clear error basis.  Reliance Ins. Co.,428 F.3d at 161; John F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 660 (3d Cir. 1986).  The District Court's interpretation of the EBA, based on extrinsic

evidence, was not clearly erroneous. It was supported by evidence that the parties intended the change in the transaction structure to apply only to funded, ERISA-qualified benefits. This evidence, as related in the District Court's findings of fact, which have not been contested, included the deal structure considered throughout the course of negotiations, shown in the January 24th Memo and the PTA, in which the allocation of liability for supplemental benefits to Prior and Prosser would be to their respective companies after the division of ATNC. Deloitte and Touche's recommendation regarding a change in the transaction structure was found by the District Court to address only ERISA-qualified pension plans, as the recommendation stated "[y]ou have indicated that there are no non-qualified pension or deferred compensation arrangements to be concerned about."

Therefore, the District Court reasonably concluded that the change in transaction structure that was affected between the PTA and the EBA was only a change in respect to ERISA-qualified plans, and not to the non-qualified supplemental benefits. The District Court rejected Prior's claim that the EBA was meant to apply to both qualified and non-qualified benefits because "Insufficient evidence was presented to support Plaintiff's contention that [the] understanding [in the PTA] was modified during the subsequent negotiations or incorporated into the EBA." Moreover, "[i]nsufficient evidence was offered to show that the parties departed from their original understanding under the January 24th Memo and PTA with respect to the allocation of the liabilities for the supplemental benefit plans for Prior and Prosser. The Court finds that the parties did not seek to change the allocation of supplemental benefit plans at any point later in the transaction."

14

Moreover, it is unlikely that ICC would have assumed responsibility for Prior's unfunded supplemental benefit unless that obligation were reflected in the price of the deal. Prior has brought forth no evidence showing an alteration in the bargained-for price to account for ICC's assumption of the liability. If ICC were to have assumed an additional liability of over $700,000, it surely would have been reflected in a change in the deal's price structure.

We conclude, therefore, that the judgment of the District Court is supported by sufficient evidence and that Prior has not presented overwhelming counter-evidence. For that reason, the District Court has not committed clear error.[2]

In light of our ruling on Prior's appeal, we need not address ICC's cross-appeal from the District Court's denial of its motion to amend its counterclaim to include contract reformation.

Accordingly, we will affirm the order of the District Court, granting summary judgment in favor of ICI.

---

[2] While Prior has argued that any ambiguity should be resolved under the principle of *contra proferentum* in his favor as the non-drafting party, *contra proferentum* is an interpretative device of last resort, used only when a court cannot resolve an ambiguity. Rottkamp v. Eger, 346 N.Y.S.2d 120, 127-128 (N.Y. Sup. Ct. 1973) (citing 3 Corbin, Contracts, § 559). Moreover, in this case, both parties were active in the drafting of the EBA; thus, the case for *contra proferentum* is not as strong as it would be in the situation of a contract of adhesion.