# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| WILMINGTON – 5190 BRANDYWINE PARKWAY, LLC, | ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | C.A. No.: N17C-04-060 EMD CCLD |
| ACADIA BRANDYWINE HOLDINGS, LLC, | ) ) ) |  |
| Defendant. | ) ) ) ) |  |

|  |  |  |
|---|---|---|
| WILMINGTON – 5190 BRANDYWINE PARKWAY, LLC, | ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | C.A. No.: N17C-04-061 EMD CCLD |
| ACADIA REALTY LIMITED PARTERNSHIP, | ) ) ) |  |
| Defendant. | ) ) ) ) |  |

Submitted: April 30, 2018
Decided: July 31, 2018

*Upon Motion to Dismiss of (i) Defendant Acadia Brandywine Holdings, LLC in C.A. No. N17C-04-060 and (ii) Defendant Acadia Realty Limited Partnership in C.A. No. N17C-04-061*
***DENIED***

Michael J. Barrie, Esq., Stephen M. Ferguson, Esq., William M. Alleman, Jr., Esq., Benesch, Friedlander, Coplan & Aronoff LLP, Wilmington, Delaware, Helen Gavaris, Loeb & Loeb LLP, New York, New York, *Attorneys for Plaintiff.*

Philip Trainer, Jr. Esq., Andrew D. Cordo, Esq., Ashby & Geddes, Wilmington, Delaware, Adam C. Silverstein, Esq., Meaghan Millan, Esq., Otterbourg P.C., New York, New York, *Attorneys for Defendants.*

**DAVIS, J.**

## I. INTRODUCTION

This contract action is assigned the Complex Commercial Litigation Division of the Court. Acadia Brandywine Holdings, LLC ("Holdings") borrowed money from Bear Stearns Commercial Mortgage, Inc. ("Original Lender"). The Original Lender and Holdings executed a Loan Agreement and a Promissory Note (collectively "Loan Documents").[1] Simultaneously with the execution of the Loan Documents, Acadia Realty Limited Partnership ("Acadia") executed and delivered a guaranty agreement (the "Guaranty") to the Original Lender. Subsequently, the Original Lender assigned its rights to collection under the Loan Documents to Wilmington – 5190 Brandywine Parkway, LLC ("Parkway").

Parkway filed separate lawsuits against Holdings[2] and Acadia,[3] seeking recourse liability against Holdings and Acadia (collectively "Defendants"). The Court joined the related claims. Parkway also filed a claim in the Court of Chancery asserting that parcels were mistakenly left out of the Loan Documents and asks the Court of Chancery for reformation of the Loan Documents. Defendants filed a motion to dismiss the action under the Loan Documents and Guaranty (the "Motion"). The Court held a hearing on the Original Motion and requested additional briefing based on the Second Amended Complaints. The parties filed the additional briefing and the Court scheduled a subsequent hearing.

---

[1] Loan Documents and Guaranty are governed by New York law by agreement of the parties.
[2] The Second Amended Complaint for Judgment on Promissory Note. Hereinafter referred to as the "Brandywine Complaint ¶ __.
[3] The Second Amended Complaint for Judgment on Guaranty Agreement. Hereinafter referred to as the "Holdings Complaint ¶ __." The Brandywine Complaint and the Holdings Complaint collectively shall be referred to as the "Complaints."

After the second hearing, the Court took the Motion, as supplemented, under advisement. For the reasons that follow, the Court—applying the legal standard under Civil Rule 12—will **DENY** the Motion.

## II. RELEVANT FACTS[4]

The Original Lender loaned Holdings $26,250,000. The Original Lender and Holdings executed the Loan Documents on June 2, 2006.[5] Additionally, Acadia executed the Guaranty, guaranteeing the debt as set forth in the Guaranty.[6] Under the Guaranty, Acadia is personally liable to Parkway for the Debt only if certain conditions are met (the "Guaranteed Obligations").[7] The Guaranteed Obligations include the entire outstanding debt if Holdings: (a) "admit[s], in writing or in any legal proceeding, its insolvency or inability to Pay its debts as they become due;" (b) "fails to maintain its status as a Single Purpose Entity . . ."; (c) "fails to obtain [Parkway's] prior written consent to any subordinate financing or other voluntary lien encumbering the Property;" or (d) "fails to obtain [Parkway's] prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Security Instruments."[8]

Further, the Guaranty states:

Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights

---

[4] Unless otherwise indicated, the following are the Relevant Facts as alleged in the Brandywine Complaint or the Holdings Complaint. For purposes of the Motion, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to Parkway. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

[5] Brandywine 2d Am. Compl., Ex. B (the "Agreement"); Brandywine 2d Am. Compl., Ex. C (the "Note"). Hereinafter collectively referred to as the "Loan Documents."

[6] Brandywine 2d Am. Compl., Ex. E. Hereinafter referred to as the "Guaranty."

[7] Guaranty § 1.2.

[8] Guaranty § 1.2(b)(E).

to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

. . .

2.13 Other Actions Taken or Omitted. Any other action taken or omitted to be taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.[9]

The Loan Agreement also contains an exculpation provision limiting Holdings' liability.[10] The exculpation provision requires the lender to foreclose on the property rather than collect from Holdings individually for a failure to pay. However, recourse liability is triggered if certain conditions are met. Those conditions triggering recourse lability are substantially similar to those triggering liability under the Guaranty.[11]

According to Parkway, on January 16, 2008, Holdings mortgaged its interest in any improvements on the Property to General Electric Capital Corporation.[12] Parkway alleges that Holdings did not obtain Parkway's consent for the transfer of interest.[13]

The Loan matured on July 1, 2016 and Holdings failed to pay the principal, accrued interest, default interest, and late fees (collectively "Debt"). Holdings is insolvent and on April 6, 2016, Acadia and Parkway acknowledged that "(a) an Event of Default has occurred and is continuing under the Loan Documents due to Borrower's failure to pay all amounts when due as

---

[9] Guaranty § 2.13.
[10] Loan Agreement § 9.3.
[11] *Id.*
[12] Holdings 2d Am. Compl. ¶ 50.
[13] *Id.* ¶ 51.

required under the Loan Documents; (b) the Debt is due and payable in full; and (c) the Loan Documents to which [Acadia] and [Holdings] are parties constitute the valid and legally binding obligations of [Acadia] and [Holdings], respectively, enforceable in accordance with their respective terms."[14]

Additionally, on April 6, 2016 Acadia and Holdings agreed in writing that "there are not sufficient funds available to [Holdings] to timely pay such Third Party Expenses . . . ."[15] Defendants acknowledged insufficient funds again on May 6, 2016 and June 9, 2016. On November 21, 2017, Holdings sued Parkway in New York state court.[16] Holdings sought an injunction compelling Parkway to advance operating costs.[17] Holdings stated it could not pay other creditors because Parkway took all proceeds from Holdings' tenants and used the money to pay down the Loan.[18]

On April 29, 2016, Holdings granted an easement to a third party[19] over a Parcel of the Property (the "Reciprocal Agreement").[20] Specifically, the Reciprocal Agreement states:

> [Subsidiary] hereby grants to [Holding] an easement over all portions of Parcel C-1 which the existing improvements have been designed to support Parcel C-2, or any portion thereof for continuous, total, adequate and safe support of all portions of the improvements existing on Parcel C-2 as of the execution of this Reciprocal Agreement.

> [Holdings] hereby grants to [Subsidiary] an easement over all portions of Parcel C-2 which the existing improvements have been designed to support Parcels C-2A or C-3, or any portion thereof for continuous, total, adequate and safe support of all portions of the improvements existing on Parcels C-2A and C-3 as of the execution of this Reciprocal Agreement.[21]

---

[14] Holdings 2d Am. Compl. ¶¶ 13, 28.
[15] Am. Compl., Ex E.
[16] Holdings 2d Am. Compl. ¶¶ 33-34.
[17] Supp. Resp. at 8.
[18] *Id.*
[19] Acadia Brandywine Subsidiary ("Subsidiary").
[20] Acadia 2d Am. Compl., Ex. I.  Hereinafter referred to as the "Reciprocal Agreement § __."
[21] Reciprocal Agreement § 2.1.

Further, the Reciprocal Agreement grants:

> a perpetual easement and right of access to all portions of [the shopping center] to the extent that such access is necessary or desirable to permit such Owner to maintain, repair or replace any portion of the property which such Owner is responsible to maintain, repair or replace, provided that: except for any emergency repairs necessary to prevent damage or injury to persons or property, such right of access shall not be exercised without prior consultation of the Owner of the area which is to be entered on; provided further that such right of access shall be exercised in such fashion as shall minimize any interference with the operation of the area entered upon.[22]

According to the Defendants, the Original Lender consented to a similar agreement in 2006 (the "2006 Declaration").[23] The 2006 Declaration allowed Subsidiary a cross-easement "to install, repair, maintain, remove and replace any plumbing, heating, cooling, lighting or similar fixture or equipment . . . [as long as the improvement] shall not impair the structural integrity of the building or adversely affect any adjacent Lot."[24]

Holdings also executed a ground lease estoppel certificate and consent (the "Ground Lease") on February 13, 2017.[25] The Ground Lease allows Subsidiary to mortgage Subsidiary's interest in the ground lease and any improvements on the property. Parkway asserts that it did not consent to the estoppel. Further, Parkway asserts that "[u]pon information and belief, [Parkway's] predecessors in interest, as applicable, did not consent to the Estoppel."[26]

The description of the Ground Lease is "[t]hat certain Net Ground Lease dated as of December 11, 2006 with respect to the Premises between Ground Lessor and Borrower, as amended and supplemented by the following documents: None."[27] A previous ground lease was executed on December 11, 2006 (the "2006 Ground Lease").[28] That 2006 Ground Lease, gave

---

[22] Reciprocal Agreement § 2.2.
[23] Mot., Ex. 3.
[24] Reciprocal Agreement § 4.3(a).
[25] 2d Am. Compl., Ex. N. Ex. N shall be referred to as the "Ground Lease."
[26] Holdings 2d Am. Compl. ¶ 38.
[27] 2006 Ground Lease, Ex. B.
[28] Holdings 2d Am. Compl., Ex. M. Hereinafter referred to as the "2006 Ground Lease").

Subsidiary rights in the Property. The 2006 Ground Lease provided Subsidiary an option to renew the 2006 Ground Lease for three additional five year terms.[29]

Parkway filed two lawsuits with the Court to collect the principal, accrued interest, default interest, and late fees (collectively "Debt") from Defendants. Parkway filed suit against Holdings to collect on the Note. Parkway also filed suit against Acadia to collect on the Guaranty. The Court joined the cases.

Additionally, Parkway filed a complaint in the Court of Chancery seeking to reform and foreclose on the mortgage (the "Chancery Action") on April 6, 2017.[30] Parkway asserts that parcels were mistakenly left out of the Loan Documents. Specifically, Parkway seeks: (1) reformation of the mortgage; (2) foreclosure upon the mortgage; and (3) appointment of a receiver to manage the mortgaged property in the interim.[31]

After filing the various lawsuits, Parkway requested that Holdings replace the existing property manager as required upon request under the Loan Documents on June 8, 2017.[32] Parkway again requested that Holdings replace the property manager on September 29, October 13, and October 20, 2017.[33] As of January 16, 2018—the filing of the Second Amended Complaint—Holdings has not replaced the property manager.

On June 9, 2017, Defendants jointly filed the Motion, arguing that none of the triggering conditions of the Loan Documents or the Guaranty had occurred. Defendants contend, therefore, that they are not responsible for the Debts through the Loan Documents and the Guaranty. Defendants state that Parkway is, instead, limited to recover against the Property.

---

[29] 2006 Ground Lease § 34.
[30] *Wilmington – 5190 Brandywine parkway, LLC v. Acadia Brandywine Holdings, LLC*, 2017-0263-MTZ (Del. Ch.). Hereinafter referred to as the "Chancery Action."
[31] Chancery Action*,* D.I. 1. Hereinafter referred to as the "Chancery Complaint."
[32] Holdings 2d Am. Compl. ¶ 75.
[33]*Id.* ¶ 76.

On September 15, 2017, the Court held a hearing on the Motion, Response, and Reply (the "Hearing"). On November 21, 2017, Holdings filed an action in New York (the "New York Action") seeking a temporary restraining order and preliminary injunction compelling Parkway to release rents to pay property expenses in order to preserve the Property.[34]

On January 16, 2018, Parkway filed Second Amended Complaints in this civil litigation against Holdings and Acadia. On February 9, 2018, Defendants filed the Supplemental Brief in Further Support of Defendants' Motion to Dismiss Second Amended Complaints ("Supplemental Motion"). On March 5, 2018, Parkway filed the Answering Brief in Response to Defendants' Supplemental Brief in Further Support of Defendants' Motion to Dismiss Second Amended Complaints (the "Supplemental Response"). On March 19, 2018, Defendants filed the Supplemental Reply Brief in Further Support of Defendants' Motion to Dismiss Second Amended Complaints (the "Supplemental Reply").

On April 30, 2018, this Court held a hearing (the "Supplemental Hearing") on the Motion, Response, Reply, Supplemental Motion, Supplemental Response, and Supplemental Reply. The Court took the matter under advisement.

### III. PARTIES' CONTENTIONS

A. **ORIGINAL MOTION AND SUPPLEMENTAL MOTION**

Defendants filed the Motion claiming that their liability under the Loan Documents and the Guaranty have not been triggered because: (1) Acadia's financial statements showing negative equity value are not admissions of insolvency; (2) the Reciprocal Agreement did not give any new rights to subsidiary because subsidiary already had an easement in the parcel; (3) Holdings did not own the property conveyed in the Estoppel; and (4) resolution of the Chancery

---

[34] Supp. Mot. at 5.

8

Action will show that either Parcel C-2 becomes part of the Property under the Loan Documents or at the time of the Loan, Holdings had unencumbered Property and Holdings never satisfied the definition of a Special Purpose Entity.

After the Hearing, Defendants filed the Supplemental Motion. In the Supplemental Motion, Defendants provide further arguments that the estoppels and the alleged admissions in the course of the New York action do not create recourse liability. Further, Defendants claim that failure to hire a new property manager did not trigger recourse liability. Finally, Defendants contend that the recourse liability under the Loan Documents and Guaranty has not been triggered because Parkway did not provide a proper Guaranty Notice.

### B.    ORIGINAL RESPONSE AND SUPPLEMENTAL RESPONSE

In the Original Response, Parkway argues that the Loan Documents and the Guaranty are triggered because: (1) Holdings made a written admission of its inability to pay debts as they became due; (2) Holdings granted an easement without Parkway's consent; (3) Holdings transferred interest in and encumbered the property without Parkway's consent; and (4) Holdings failed to maintain its status as a special purpose entity.

In the Supplemental Response, Parkway reiterates that: (1) Holdings transferred its fee interest in a portion of Lender's collateral without Lender's consent; (2) Holdings consented to nearly $7.1 million in subordinate financing and liens against Lender's collateral without Lender's consent; (3) Holdings publicly declared that it cannot pay its debts as they become due; and (4) Holdings failed to replace the property manager after Parkway's requests.

Parkway asserts that it "faithfully and in good faith fulfilled all of its obligations to Borrower, has and is vested with all the rights of the Original Lender . . . and has otherwise performed all acts necessary to preserve all of its rights under [the Loan Documents and] the

9

Guaranty."[35]  Parkway states that the Loan Documents and Guaranty do not require any other notice or conditions to commence legal action.

## IV. STANDARD OF REVIEW

### A.  CIVIL RULE 12(B)(6)

Upon a motion to dismiss under Civil Rule 12(b)(6), the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[36]  However, the Court must "ignore conclusory allegations that lack specific supporting factual allegations."[37]

## V. DISCUSSION

Parkway alleges several triggers for individual liability under the Loan Documents and the Guaranty.  In the Motion, Holdings and Acadia argue that Parkway does not have any basis to collect the Debt from the Defendants individually.  Rather, Parkway must go after the Property and can proceed with the foreclosure action.  Although Defendants raise several grounds for dismissal, even if one of Parkway's methods of recourse liability goes forward under a 12(b)(6) standard, then the case will move forward.

The parties agree that New York law applies to the Loan Documents.[38]  Unless otherwise noted, the Court will apply New York law for contract construction and interpretation in this civil litigation.  "Under New York law, the initial interpretation of a contract is a matter of law

---

[35] Holdings 2d Am. Compl. ¶22; Acadia 2d Am. Compl. ¶ 79.
[36] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[37] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).
[38] *See* Agreement § 10.3; Mot. at 6; Note Art. 9; Mot. at 9; Resp. at 10.

10

for the court to decide. Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law."[39] "On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor."[40] "However, 'when the language of a contract is ambiguous, its construction presents a question of fact,' which of course precludes summary dismissal."[41]

"[T]he mere fact that the Parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous."[42] "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"[43] "[A] term is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."[44] "A contract's ambiguity is a matter of law that we review *de novo*."[45]

"Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'"[46] "The entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the lights of the obligation as a whole and

---

[39] *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010).
[40] *Id.*
[41] *Bank of Am. Corp. v. Lemgruber,* 385 F. Supp. 2d 200, 226 (S.D.N.Y. 2005).
[42] *Serdarevic,* 760 F. Supp. 2d at 329.
[43] *Id.*
[44] *Prior v. Innovative Commc'ns Corp.*, 207 Fed. Appx. 158, 163 (3d Cir. 2006) (interpreting New York law).
[45] *Id.*
[46] *Schron v. Troutman Sanders LLP,* 20 N.Y.3d 430, 963 N.Y.S.2d 613, 986 N.E.2d 430, 433 (2013).

the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought."[47] "Words and phrases used in an agreement must be given their plain meaning . . . ."[48] "The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect."[49] "Even if there was an inconsistency between a specific provision and a general provision of a contract . . . the specific provision controls."[50]

## A. PARKWAY'S CLAIM THAT DEFENDANT'S FORECLOSURE ACTION ALLOWS RECOURSE LIABILITY REQUIRES A DETERMINATION BY THE COURT OF CHANCERY

There is a conceivable set of circumstances that Parkway could personally recover based on Holdings' status or lack of status as a Special Purpose Entity. However, the Court cannot decide the issue until the Chancery Action is resolved. Moreover, the Court notes that discovery may be required to resolve the issue. The parties dispute whether Parcel C-2 is part of the Loan Documents. Currently, an action is pending in the Court of Chancery. Parkway asserts that Holdings admits in the Court of Chancery Action that it owns real property that is not encumbered and that Holdings did not intend to include Parcel C-2 as part of the Property.

The Loan Documents and Guaranty also state that Acadia becomes liable for the Debts if Holdings fails to maintain its status as a Special Purpose Entity. Owning unencumbered property could remove Holdings from its status of Special Purpose Entity. To maintain the Special Purpose Entity status, Holdings may not acquire any unencumbered property. However,

---

[47] *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009) (quoting *Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524 (1927)) (internal quotations omitted).

[48] *Bianco v. Bianco*, 36 A.D.3d 490, 491, 830 N.Y.S.2d 21 (N.Y. App. Div. 2007).

[49] *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956); *see also In re El-Roh Realty Corp.*, 902 N.Y.S.2d 727, 729 (N.Y. App. Div. 4th Dept. 2010) ("The contract must be read as a whole to determine its purpose and intent and it should be interpreted in a way that reconciles all its provisions, if possible) (internal quotations omitted").

[50] *Id.*

12

it is unclear at this stage of litigation whether Holdings would trigger recourse liability if

Holdings never had special purpose entity status when the parties executed the Loan Documents

and the Guaranty. Specifically, the Loan defines a Special Purpose Entity as:

> A corporation, limited partnership or limited liability company that, since the date of its formation and at all times on and after the date thereof, has complied with and shall at comply with the following requirements unless it has received either prior consent to do otherwise. . .

> (i) is and shall be organized solely for the purpose of (A) in the case of Borrower, acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into and performing its obligations under the Loan Documents with Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing; . . . .

> (iii) has not owned and shall not own any real property other than, in the case of Borrower, the Property; . . . . [51]

In the Court of Chancery action, Holdings denied that the parties intended to include

Parcel C-2 in the Mortgage.[52] Parkway asserts that this denial shows that Holdings owned Parcel

C-2, that Parcel C-2 is not covered by the mortgage, and that Holdings failed to maintain its

status as a Special Purpose Entity because Holdings owned property unencumbered by the

mortgage.

Defendants assert that Parkway mistakenly interprets Holding's response to the Court of

Chancery Complaint. First, Defendants argue that if Parkway wins the Chancery claim, the

parcel will be included in the Property covered under the Loan Documents. Second, Defendants

contend that if Parkway loses its Chancery claim, then Holdings owned property other than the

Property under the Loan Documents and could not "fail to maintain its status as a Special

Purpose Entity" because it never had the Special Purpose Entity status.

---

[51] Agreement § 1.1 (defining "Special Purpose Entity").

[52] Opening Br. states that the reformation action in the Court of Chancery is for Parcel C-2. The Plaintiff's Answering Brief In Opposition To Defendants' Motion to Dismiss states that there are two parcels.

The decision in the Chancery Action will directly affect at least this one basis for recourse liability under the Loan Documents and the Guaranty. Holdings' status as a Special Purpose Entity cannot be decided before the Court of Chancery rules in the Chancery Action. If the Court of Chancery decides that Parcel C-2 is part of the Property, then Holdings maintained its status as a Special Purpose Entity. If Parcel C-2 is not part of the Property, then further discovery and argument will be required based on the Loan's definition of Special Purpose Entity. Additionally, Defendants argue that if Parcel C-2 is not part of the Property, then the statute of limitations has run because Holdings would have lost its status as a Special Purpose entity in 2006. As such, the Court finds that it would be premature to rule on the issue until the Court of Chancery determines whether Parcel C-2 is part of the Loan Documents.

For this reason alone, the Court would need to deny the Motion. As discussed below, the Court finds that the factual record needs to be developed in other ways and, so, the Motion is denied for those reasons as well.

B. **THE REMAINING ISSUES REQUIRE DISCOVERY AND CONSIDERATION OF DOCUMENTS OUTSIDE THE COMPLAINT**

Parkway alleges that Holdings impermissibly granted rights in the Reciprocal Agreement triggering recourse liability. In the Motion, Defendants argue that the 2006 Declaration previously granted an easement and the Reciprocal Agreement is a continuation and renewal of the earlier easement. Holdings argues that it operated under the 2006 Declaration and that the Reciprocal Agreement conveys the same rights. In the Motion, Defendants state that Original Lender consented to the 2006 Declaration.[53] Parkway argues that the rights in the Reciprocal Agreement are greater than the rights conveyed in the 2006 Declaration. The Court notes that the 2006 Declaration is a document not made part of the Complaints. The Court would need to

---

[53] Mot. at 8, 10.

convert the Motion to a summary judgment motion if it considered the 2006 Declaration.[54]

Further, there is a dispute whether the rights conveyed in the Reciprocal Agreement are greater than those granted in the 2006 Declaration. Finally, discovery is required to determine if Original Lender consented to the 2006 Declaration. As such, this claim survives under the 12(b)(6) standard.

Next, Parkway argues that the Ground Lease conveyed interest in the Property which triggered recourse liability.[55] In the Motion, Defendants argue that Holdings did not own the property subject to the Ground Lease. Rather, the Ground Lease vested the property interest in a third party. The execution of the Ground Lease occurred on February 13, 2017. The Ground Lease allows Subsidiary to mortgage its interest in the Ground Lease and any improvements on the Property. Additionally, the Ground Lease grants Subsidiary fee title of any improvements upon the Property. The Ground Lease also references back to a December 11, 2006 agreement with substantially similar rights. Defendants also argue that they were permitted to enter into Ground Lease because prior written consent is not required for a non-material lease that is under 10,000 square feet.[56] Since the Original Lender and Holdings executed the Loan Documents earlier in 2006, further information is required to determine if Holdings had permission to entered into the December 11, 2006 agreement, if it was based upon an earlier agreement that pre-dated the execution of the Loan Documents, or if prior written permission was required for

---

[54] *See* Super. Ct. Civ. R. 12(b) (emphasis added); *see Furman v. Del. Dept. of Transp.*, 30 A.3d 771 (Del. 2011) (finding that trial court was required to convert a motion to dismiss into a motion for summary judgment when the Court relied upon materials outside the pleadings); *Veney v. United Bank*, 2017 WL 3822657, at *3.

[55] *See* Guaranty § 1.2(b) (stating that Acadia will be liable for the Debt if Holdings "fails to obtain Parkway's prior written consent to any subordinate financing or other voluntary lien encumbering the Property" or "if Holdings fails to obtain Parkway's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Loan Agreement or the Security Instruments.").

[56] Mot. at 8.

the Ground Lease. The Court finds that development of the record is also required to determine whether the Ground Lease did in fact encumber the Property.

Parkway also asserts that Holdings' failure to replace the property manager after a demand triggers recourse liability.[57] Guaranteed Obligation means "the entire amount of Debt . . . if after the Guaranty Notice . . . Borrower fails to appoint a new property manager upon the request of Lender as permitted under the Loan Agreement, each as required by, and in accordance with, the terms and provisions of the Loan Agreement or the Security Instrument."[58] Parkway alleges that it delivered a Guaranty notice on March 16, 2017.[59] Parkway demanded that Holdings change the property manager on June 8, September 29, October 13, and October 20, 2017. [60] Holdings failed to change the property manager. Holdings challenges the validity of the Guaranty Notice. The March 16 Notice "DEMANDS payment in full of the above-amounts, together with any amounts coming due under the Loan Documents from and after the date hereof, within seven (7) days from the date hereof."[61] Holdings argues that the March 16 Notice was not delivered in accordance with the Loan Documents. Further, the March 16 Notice did not provide a notice of default and an opportunity to cure. Rather, the March 16 Notice was a notice of default for nonpayment and does not qualify as a Guaranty Notice—as the remedy would be a foreclosure action against the Property. Applying Civil Rule 12 to the Complaints, the Court finds that Parkway pleaded a potential claim for recourse liability based on Holdings' failure to appoint a new property manager upon request.

---

[57] Guaranty § 1.2 (stating "Guaranty Notice shall mean any notice and cure period under the Loan Documents, or, if none provided, ten (10) days' notice and opportunity to cure within such time, the Guaranty Notice shall specify that a default thereunder shall result in the Guarantor being liable for the entire Debt.").
[58] Guaranty § 1.2(b)(ii).
[59] Holdings 2d Am. Compl. ¶ 16.
[60] *Id.* ¶¶ 75-76.
[61] Supp. Resp., Ex. 5.

Finally, Parkway asserts that Holdings' made admissions of insolvency in the New York Action which triggered recourse liability. Parkway relies upon financial statements showing a negative equity value, expense notices from Parkway's servicer that there are insufficient funds to timely pay certain third party expenses,[62] and Holdings' statements from the New York Action where Holdings stated "[a]fter stretching terms for the past couple of months, property expenses are now or soon will be past due, and critical services (such as fire phone lines, fire hydrant and riser water service, pest control, security services, utilities, etc.) to operate the Property will soon be at risk of being shut off."[63]

Defendants rely upon *D.B. Zwirn Special Opportunities Fund, L.P. v. SCC Acquisitions, Inc.*, which states that financial reports indicating that the debtor's liabilities exceeded their cash and assets do not constitute written admissions of insolvency.[64] The Court does not find fault with the reasoning in *D.B. Zwirn Special Opportunities Fund, L.P.*; however, the Complaints rely on more than just Holdings' financial statements. Parkway argues that it has financial statements and the admissions of insolvency from the New York Action. Holdings argues that it was seeking release of funds because the Property is making money; however, Parkway is sweeping the accounts and not allowing Holdings to pay operating expenses on the Property. Therefore, the Court finds that further factual development is needed regarding Holdings' statements in the New York Action. Parkway alleges that Holdings admitted its insolvency in the New York Action. On the face of the Complaints, the claim survives a 12(b)(6) motion standard because Parkway's claim relies not only on financial statements but also Holdings' statements of insolvency made in the course of the New York Action.

---

[62] Holdings made these statements on April 6, May 6, and June 9 of 2016.
[63] 2d Am. Compl. ¶¶ 33-34.
[64] 74 A.D.3d 530, 530 (N.Y. App Div. 1st Dept. 2010).

# VI. CONCLUSION

For all the foregoing reasons, the Court **DENIES** the Motion.  The Court cautions the parties to develop the record as set forth in this decision.  The Court has determined, under Civil Rule 12, that Parkway has pleaded causes of action upon which relief can be granted; however, the Court—as discussed at the hearings on the Motion—believes that some, if not all, of the claims can be disposed of on summary judgment once the factual record has been developed.

**IT IS SO ORDERED**

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     File&ServeXpress